# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | **:** | |
| v. | **:** | CRIMINAL CASE NO.: |
| KELVONE CHARLESTON | **:** | 1:15-cr-00127-TWT-JSA |

## ORDER AND REPORT AND RECOMMENDATION

This case is before the undersigned on the motions of Defendant Kelvone Charleston to suppress statements [14] [17] and to suppress evidence [16].[1] Defendant was shot during his attempted flight from arrest on April 4, 2015. He was still in the hospital on the morning of April 7, and still under some influence of a prescription pain medication dose he received approximately four hours earlier, when the officers secured a *Miranda* waiver and interrogated him. The primary issues raised by Defendant's Motions to Suppress are whether the Government can prove that Defendant's confession, waiver of this *Miranda* rights, and waiver of this right to prompt presentment before a judicial officer, were voluntarily made in these circumstances. As explained below, the evidence ultimately shows

---

[1] After the evidentiary hearing, which lasted three separate days, the Defendant filed a post-hearing brief that indicated he would proceed only on his Motions to Suppress Statements and that he would present no argument on the Motion to Suppress Evidence. Def. Br. [62] at 1 n. 1. Thus, the undersigned will not substantively discuss the issues surrounding the Motion to Suppress Evidence and, rather, recommends denial of this motion as abandoned.

Defendant's actions on April 7 to be voluntary.  Thus, the Court **RECOMMENDS** that the Motions to Suppress be **DENIED**.

## I.  BACKGROUND

In the early morning hours of April 4, 2015, FBI agents and local law enforcement officers tracked the Defendant to a CVS pharmacy in Cumming, Georgia, which the agents believed that Defendant was about to rob.  Tr. I [47] at 13, 18-22.  After a foot chase, the Defendant fled to his car and attempted to drive away.  The Defendant pulled out what he later claimed was a "fake" gun, and one of the agents testified that Defendant pointed the gun at them while he attempted to drive away. *Id.* at 31-35.  As the Defendant's car drove towards agents who were standing on foot, one or more agents discharged their firearms in the direction of the Defendant's car, ultimately wounding him.  *Id.* at 34-38.  Defendant's car also collided with two law enforcement vehicles shortly thereafter and came to a stop. *Id.*  The Defendant was arrested and an ambulance was immediately called to bring him to the nearest hospital, North Fulton Hospital, to treat him for his gunshot wounds.  *Id.* at 40, 133.[2]

FBI Task Force Officer Mark Gardner rode in the ambulance with the

---

[2] The undersigned provides only very general background as to the circumstances that led the officers to be conducting surveillance, and the specifics of the chase and shooting, as those issues are not directly pertinent to the pending Motions to Suppress Statements.

Defendant.  According to TFO Gardner, he asked no questions of the Defendant during the ambulance trip, but the Defendant volunteered a series of statements, including that he was experiencing financial problems, that he had "fucked up shit" here, and had three kids and wife who was not working and that he needed to pay bills.  *Id.* at 83, 84, 87, 88.  TFO Gardner told him, "he will have his opportunity to speak to the investigators.  My purpose there was not to question him."  *Id.*  During the hospital stay, the prosecution informed U.S. Magistrate Judge Gerrilyn G. Brill, the duty judicial officer, of the arrest, in an attempt to arrange for an initial appearance at the hospital if necessary.  *Id.* at 134-135.  Judge Brill, however, declined such a procedure.  *Id.*

Defendant underwent surgery on April 5 and was ultimately released on the morning of April 7, 2015.  *Id.* at 135; Tr. II [58] at 16.  Early that morning, as early as approximately 3:02 am, but perhaps as late as 3:44 am, Defendant was administered a dose of a prescription pain medication known as Dilaudid.  Tr. II [58] at 35-36; Gov't Ex. 46.[3]  As of 3:44 am, 32 minutes after receiving the drug,

---

[3] The records include a reference to Dilaudid at 3:02 am and 3:44 am.  The first treating physician who testified interpreted this record as saying that the Defendant was administered Dilaudid at 3:02 am and that the nurse reassessed Defendant's pain (but did not administer another dose) at 3:44 am.  Tr. II [58] at 37, 54, 57, 69-70.  The second treating physician indicated that he could not say with certainty what these two entries meant.  *Id.* at 86-87.  The Court finds the most credible testimony to be that of the first doctor, Dr. Dhulipala.  After all, the 3:44 am notation refers to Defendant's pain level as only being at a level 4 of 10, which is not considered to be high, *see id.* at 36-37, 69-70, and therefore would

Defendant rated his pain as 4 on a scale of up to 10.  *Id.* at 37.

Defendant was examined again by Dr. Dhulipala at 6:36 am.  Tr. II [58] at 46.  Dr. Dhulipala did not make a notation as to pain level at that time.  *Id.*  Dr. Dhulipala testified that he would usually inquire about pain if a patient complains or appears to be in pain.  *Id.*  at 46-47 ("The only time I document if a patient is in pain is if I see them in pain or if they tell me they're in pain. If they don't tell me they're in pain or if I don't observe specifically that I'm concerned that he's in pain, we usually won't document that.").  Thus, the absence of any notation at 6:36 am likely indicates that the Defendant did not complain or exhibit symptoms "that are concerning for pain to me."  *Id*.  Dr. Dhulipala also did not document any specific assessment of Defendant's mental state at 6:36 am.  *Id.* at 65.  Dr. Dhulipala inferred from the absence of notations to the contrary that Defendant followed commands normally and responded appropriately to Dr. Dhulipala's questions.  *Id.*

Approximately 45 minutes later, at 7:16 am that morning, FBI Agents Szabo and Jonsson interviewed Defendant at the hospital.  *See* Tr. I [47] at 134, 140-141,

---

seem to be an unlikely basis to administer another dose just 32 minutes after the first one.  Thus, the Court is inclined to believe that Dr. Dhulipala's interpretation of these records–that the drug was administered at 3:02 am and merely reassessed at 3:44 am–is most likely to be correct.  Nevertheless, the undersigned's recommendation does not turn on this issue and would be the same even if the drug were administered at 3:44 am.

146.  According to the testimony of the agents, they first inquired of the duty nurse

on station, who indicated that Defendant was lucid and able to communicate.  *See*

*id.* at 138.[4]

The audio recording and a transcript of the interview were introduced into

evidence.  Gov't Exs. 1A, 2.  The agents went over the standard FBI advice of

rights form with the Defendant, and a waiver of the right to prompt presentment

before a Magistrate Judge, orally and in writing.  Tr. I [47] at 144-147, 151.  The

Defendant read both forms aloud, indicated that he understood, and executed both

forms.  *Id.* at 146-151; Gov't Exs. 3, 4.  The agents testified, and the recording

shows, that the Defendant provided appropriate responses to questions, accurately

provided biographical information, and was aware as to his surroundings.  *See* Tr.

[47] at 138-140.  The Defendant proceeded to give an extensive and apparently

generally appropriate statement of what happened on April 4, and why he planned

on robbing the CVS that morning.  However, he also provided information

---

[4] The Defendant objected to this testimony as hearsay, since the prosecution did not call the nurse herself as a witness, but rather only called the agents to testify as to what this nurse supposedly told them.  The Court overruled the hearsay objection, since the rules of evidence do not strictly apply in a suppression hearing, and because in any event the agents' testimony would be relevant at least to explain the reasonableness of their own actions.  Nevertheless, the Court places minimal weight on the accuracy of any medical opinion rendered by the non-testifying nurse.  This opinion is also largely duplicative of the information provided by Dr. Dhulipala, which suggests that as of 6:36 am the Defendant did not complain about or appear to suffer significantly from pain, and was following directions and responding to questions in an appropriate and normal manner.

apparently perceived to be in mitigation, including the claim that he changed his mind about robbing the bank even before realizing the police were surveilling him, that he only had a "fake" gun, and the fact that he had a young family and was unable to pay bills.  He also specifically denied having been the robber in various other past incidents, and denied that he was the individual depicted in surveillance photographs during those robberies.  *See* Ex. 1A at 28 (despite noting that "I am in pain," nevertheless asserting "those aren't me" in response to the agents' attempts to ask Defendant about other prior robberies).

The Defendant became more upset as the interview went on, and as the agents continued to ask him about other prior robberies.   During a moment when he was crying, the agents asked, "what's going on in your mind right now."  The Defendant did not respond with any complaint about pain, but rather stated that he was upset because "the time I'm going to be away from my family."  *Id.* at 32.  The Defendant also expressed concern, "I want y'all to help me . . . I really do but I don't want to get buried by the system from what I'm telling y'all."  *Id.* at 27.  The interview lasted approximately 100 minutes. Defendant complained about pain at times during the interview. *See, e.g.,* Gov't Ex. 1A at 28.  But he repeatedly described his major source of distress during the interview as "I love my family that I might never see again (crying)."  *Id.* at 32.

Shortly thereafter, at approximately 9:28 am, Dr. Joshua Moore examined

Defendant.  Tr. II [58] at 80, 84.  Defendant complained of shoulder pain, but Dr. Moore noted that Defendant was in no apparent distress, and was awake, alert and well oriented.  *Id.* at 82; Gov't Ex. 45.  Dr. Moore signed the discharge order, although the Defendant was not physically released from the hospital until later than morning.  Tr. II [58] at 89-90.  The Defendant was brought to Court for his initial appearance before Judge Brill at 2:50 pm that afternoon, April 7, 2015 [4].

At the evidentiary hearing, the Defendant offered expert testimony in the field of pharmacology from pharmacist George F. Bachman.  Mr. Bachman explained the general side effects of Dilaudid, which is an opiod drug that has a "depressive" effect on "core brain functions that can cause sedation, dizziness, lethargy."  Tr. II [58] at 105.  The most specific potential cognitive side effect of Dilaudid is that it can create an "altered state" of euphoria, in which a patient's "anxiety or stress may be lowered."  *Id.* at 107.  In other words, Mr. Bachman agreed that a patient under the influence of Dilaudid "might be okay about doing just about everything that you suggest to them," because of a feeling of euphoria and reduction of inhibitions.  *Id.* at 107.  Mr. Bachman referred to a 1996 study as to 86 patients taking Dilaudid "that their cognitive abilities in doing various cognitive tests were severely altered."  *Id.* at 108.

Mr. Bachman testified that medications generally are associated with a "peak performance" period, after which the body increasingly metabolizes and

eliminates the drug.  *See id.* at 102-103.  In the case of Dilaudid, Mr. Bachman

explained that the "peak performance" of the drug occurs approximately one hour

after administration, and that the drug's potency has a half life of approximately

every 2.3 hours.  *Id.*; Def. Ex. 1.  In other words, every 2.3 hours after

administration, the strength of the drug in the bloodstream is reduced in half.  *Id.*

Mr. Bachman provided a summary exhibit (Def. Ex. 1), that provides approximate

amounts of strength of Dilaudid in the bloodstream at various times.  Assuming an

administration of Dilaudid at 3:02 am, the medication would have reached its

"peak" at approximately 4:02 am, would have reached its first half-life of potency

by approximately 5:20 am.  *Id.*  By 7:38 am–approximately 20 minutes into the

interview–the drug's potency would have reached its second half-life, or roughly

one quarter of its original potency.  *Id.*  Assuming that Dilaudid was administered

at 3:44 am, the peak would be at 4:44 am, the first half-life would be reached at

6:02 am, and the second half-life would be reached at 8:20 am.  *Id.*  Thus,

assuming a 3:44 am administration, the drug's potency would have been

somewhere between the first and second half-life (perhaps roughly at the one-third

mark) at around the start of the interview in this case.[5]

---

[5] The Court considers and places weight on Mr. Bachman's testimony as to
the side effects, risks and potency/elimination rates of Dilaudid.  However,
Defendant also asked questions of Mr. Bachman as to how a medical professional
might assess a patient's cognitive functioning.  *See, e.g.,* Tr. II [58] at 109 ("Q. It
would be fair to say you'd have to do a lot more extensive testing to determine, for

## II.     DISCUSSION

### A.     *Defendant's Statements Were Made Voluntarily and In Compliance With Miranda*

If a Defendant moves to suppress her incriminating statements to law enforcement, the Government bears the burden to show that the Defendant's statements were made voluntarily.  *See Jackson v. Denno*, 378 U.S. 368 (1964). Determining whether a statement is voluntary depends on whether, under all of the surrounding circumstances, the statement was the product of the accused's "free and rational" choice. *United States v. Jones*, 32 F.3d 1512, 1516 (1994); *see Arizona v. Fulminate*, 499 U.S. 279, 285–88 (1991). The Eleventh Circuit has

---

example, as I stand before you, as to whether or not there's any drugs in my system and their having an impact on me? A. Unless there was stumbling around, yes, it would be difficult."); Tr. III [59] at 24 ("Q.  Is it possible simply by looking at the medical charts of Mr. Charleston and observing him facially and hearing his responses to questions would not necessarily tell you whether or not he's fully functional?  A. That would be a hard assessment to make. Q. Would it be fair to say that in order to measure cognitive impairment, you would need something more extensive, for example, neurological or psychological testing? A. And there are such tests that are performed.")

The Court places minimal weight on such statements, as Mr. Bachman, who is not a doctor, was not offered as an expert on cognitive, neurological or psychological testing, how to assess or diagnose patients, and/or how to read a medical chart.  Nor was it explained how Mr. Bachman's experience as a pharmacist would permit him to render opinions on these subjects.  As noted previously, the rules of evidence do not strictly apply at a suppression hearing.  But the Court still must make findings based on reliable and supportable evidence.  The Court therefore declines to consider Mr. Bachman's references to, for example, unidentified neurological or psychological testing that might have shed light on whether Defendant was actually impaired or not.

stated:

> Sufficiently coercive conduct normally involves subjecting the accused
> to an exhaustingly long interrogation, the application of physical force or
> the threat to do so, or the making of a promise that induces a confession.
> Isolated incidents of police deception, and discussions of realistic
> penalties for cooperative and non-cooperative  defendants, are normally
> insufficient to preclude  free choice.

*Jones*, 32 F.3d at 1517 (quotation omitted).

The primary focus of the voluntariness inquiry is whether there has been police overreaching. *United States v. Bernal–Benitez*, 594 F.3d 1303, 1319 (11th Cir. 2010). The Court looks to the totality of the circumstances to determine whether a confession was voluntary, "including the details of the interrogation and the defendant's characteristics." *Id.* Ultimately, the question is whether the defendant "made an independent and informed choice of his own free will, possessing the capability to do so, his will not being overborne by the pressures and circumstances swirling around him." *United States v. Rouco*, 765 F.2d 983, 993 (11th Cir.1985) (citation and quotations omitted). Among the non-exclusive factors to consider are the Defendant's education and intelligence, length of detention, length of questioning, the use of coercive interrogation techniques and whether Defendant was advised of his constitutional rights. *Id.*

Moreover, in  *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that a suspect who is in custody must be advised of his right to remain silent

and of his right to the assistance of counsel prior to any interrogation by law enforcement.  The Supreme Court also made clear that the Government has the burden to show the knowing and intelligent nature of a waiver. *See Miranda*, 384 U.S. at 475. Indeed, the Supreme Court made clear that "[if] the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests upon  the government to demonstrate that the  defendant knowingly and intelligently waived  his privilege against self-incrimination and  his right to retained or appointed counsel."  *Id.*

The Supreme Court instructs us to look for two things in assessing this question:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal[s] both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quotation marks and citation omitted).

### 1.    The Statements On April 4, 2015

The Defendant's motion refers, although makes only passing argument with respect to, his statements in the ambulance to TFO Gardner on April 4th.  It is

undisputed that Defendant had been arrested at that point and had not yet been furnished his *Miranda* rights.  Thus, Defendant appears to request that his non-*Mirandized* statements in the ambulance be suppressed.

*Miranda* only applies, however, to statements that result from custodial *interrogation*.  "The term interrogation under Miranda refers not only to express questions, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).  The Eleventh Circuit has held that "[v]oluntary and spontaneous comments by an accused, even after Miranda rights are asserted, are admissible evidence if the comments were not made in response to government  questioning." *Cannady v. Duggar*, 931 F.2d 752, 754 (11th Cir. 1991).  The Defendant bears the burden to show that he was in custody and subjected to governmental questioning.  *See United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir.1977) ("[I]f a defendant shows that a confession was obtained while he was under custodial interrogation, the government then has the burden of proving that the defendant voluntarily waived his privilege against self-incrimination.")[6]; *United States v. Peck*, 17 F.Supp.3d 1345, 1353-54 (N.D.Ga.

---

[6] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*) (Adopting as binding precedent all decisions rendered by the United States Court of Appeals for the Fifth Circuit prior to September 30, 1981);

2014) (Totenberg, J.) (gathering authority).

Here, TFO Gardner testified that he asked no questions of Defendant and that Defendant's comments were spontaneously uttered.  Defendant, who bears the burden to prove interrogation, offers no proof or legal argument on this question.  Thus, the Court has no basis to find that Defendant was subjected to interrogation in the ambulance on April 4 and therefore finds that *Miranda* is inapplicable.

Because Defendant does not articulate any particular suppression argument with regard to the April 4 statements, it is not clear whether he also contends that the statements were made involuntarily under *Jackson v. Denno*.  In any event, the Court finds that the Government has met its burden to adduce evidence of voluntariness.  Although Defendant was obviously wounded, the Emergency Medical Technician who treated him at the scene and in the ambulance explained that Defendant was conscious, appropriately answering questions, had generally normal blood pressure, was reporting pain "of five out of ten," and otherwise "was doing fine."  Tr. I [48] at 76-78.  Defendant's leg reportedly had been "bleeding pretty heavily" but was controlled through application of a tourniquet even before the arrival of the EMT. *Id.* at 75.The EMT asked standard screening questions to assess whether the Defendant was "mentally with it or if [he was] going into shock," and he testified that the Defendant's responses did not indicate such a problem.  *Id.* at 77.

The nature of the Defendant's statements to TFO Gardner also suggest voluntariness. The statements were logical, appropriate, and appeared to express regret. These statements suggest that the Defendant fully understood what was happening and the significance of his situation. And the Defendant's reference to his financial difficulties and family responsibilities also suggests a desire to help his situation through offering a mitigating explanation.

Also, the record is devoid of any indication of police overreaching or coerciveness on the part of TFO Gardner. The record does not suggest that he took advantage of Defendant's medical situation, that law enforcement deprived Defendant of medicine or medical treatment to force a confession, or that TFO Gardner attempted to question him at all. Rather, Gardner's unrebutted testimony was that he shut down Defendant's voluntary utterances by telling the Defendant that he (Gardner) was not there for that purpose and that the case investigators would give Defendant a chance to tell his side of the story at a later time. In all the circumstances, therefore, the undersigned finds Defendant's spontaneous utterances in the ambulance to have been voluntarily made.

## 2.     The Statements on April 7, 2015

The bigger question raised by Defendant's motion was whether his statements in the hospital on April 7th, and his waivers of *Miranda* and prompt presentment rights, were made voluntarily. It is undisputed that these statements

were made in response to custodial interrogation.  Thus, it is the Government's burden to prove the voluntariness of the waivers, as well as the lack of coercion associated with the statements themselves.

The undersigned finds in the Government's favor on this question. Although Defendant still had Dilaudid in his system, the strength of that dosage had degraded in half between one and two times.[7]  Moreover, that a Defendant has been administered medication, or otherwise ingested controlled substances, does not render his statements and waivers *per se* involuntary.  *See United States v. Martinez-Garcia*, 533 Fed.Appx. 800, 801 (9th Cir. 2013) (affirming conclusion that statement made was voluntary despite pain treatment based on particular evidence of pain levels and medication dosage close in time to the interview); *United States v. Contreras*, 372 F.3d 974 (8th Cir. 2004) (18-year-old who had allegedly used methamphetamine evening before, and marijuana on day of, his arrest voluntarily waived his Miranda rights before giving incriminating statements to police, so that statements did not have to be suppressed, where officers making arrest both testified that arrestee appeared to be sober and in control of his

---

[7] Again, most likely, the Defendant had received Dilaudid on 3:02 am, and therefore the dosage had degraded in half twice (to approximately one quarter strength) by the time of the interview.  The strength in Defendant's system would be somewhat higher assuming a 3:44 am administration, although still degraded by more than half.  The dispute between a 3:02 am and 3:44 am administration does not alter the undersigned's recommendation.

faculties); *United States v. George*, 987 F.2d 1428, 1430-31 (9th Cir. 1993) (finding that the defendant voluntarily waived Miranda despite pain because he responded coherently to questions, gave responsive answers, and was not unconscious or incoherent during questioning, noting that "a defendant can voluntarily waive his Miranda rights even when he is in the hospital, on medication, and in pain") (gathering authority); *Butler v. Richards*, 947 F.2d 948 (7th Cir. 1991) (unpublished) ("Phillips does not cite any authority for that proposition and we believe that in the absence of some other factor indicating coercive activity on the part of the police merely questioning the defendant while he is receiving pain medication does not call into question the voluntariness of a confession."); *United States v. Lewis*, 833 F.2d 1380, 1384–84 (9th Cir.1987) (holding waiver voluntary when defendant was in pain from recent surgery and had recently received a general anesthetic).

The question, rather, is whether the evidence as a whole shows that the Defendant's decision to waive his rights and speak to law enforcement was the product of a free and rational choice.  Here, the weight of the evidence is consistent with free and rational conduct.

Defendant did not appear to be in pain or distress to Dr. Dhulipala at 6:36 am–less than an hour before the interview–and Dr. Dhulipala noted no concerns about Plaintiff's mental state and ability to rationally understand and follow

directions.  Dr. Moore saw Defendant shortly after the interview, and also noted that Defendant was in no apparent distress and was awake, alert and well-oriented. The physicians concluded that Defendant was eligible for discharge during this time, and he was in fact discharged shortly thereafter.  The agents' testimony about the interview, and the undersigned's review of the recording and transcript of that interview, also suggest that the Defendant was answering questions rationally, audibly and clearly, and that he appeared to fully understand what was happening to him and what legal jeopardy he was facing.

The Court has carefully considered the opinions of Mr. Bachman.  In particular, the Court has credited Mr. Bachman's testimony that a potential side effect of Dilaudid is to impair a patient's cognitive abilities.  The most specific and concrete potential impact of Dilaudid that Mr. Bachman identified was the creation of a state of "euphoria" that could reduce anxiety or inhibitions.  An obvious concern, therefore, is whether a suspect in a Dilaudid-altered state may be influenced not to appreciate the seriousness of his situation, and may thereby fail to make a fully rational decision to volunteer admissions and waive his rights.

Mr. Bachman noted, however, that the impacts of the drug on any individual at any given time is "variable" and uncertain.  Tr. III [59] at 23.  On this particular record, there is simply no indication that the fractional amount of Dilaudid still in Defendant's bloodstream during the interview was substantially impacting his

lucidity or his ability to rationally appreciate his situation and make decisions.  As set forth above, the Defendant very clearly expressed his understanding and great concern about the seriousness of his situation, and was audibly upset about the "the time I'm going to be away from my family."  Gov't Ex. 1A at 32.  The Defendant also was audibly upset and crying, explaining "I want y'all to help me . . . I really do but I don't want to get buried by the system from what I'm telling y'all."  *Id.* at 27.  If anything, this last statement appears to strongly suggest that the Defendant knew he did not have to speak, and knew that by speaking he was risking legal danger, but had made the calculated decision to speak because "I want y'all to help me. . . ."

Indeed, the Defendant appeared to focus on offering self-serving and mitigating details, including his claim that he only had a "fake" gun, *see* Ex. 1A at 11-12, that he had decided against robbing the CVS, *see id.* ("I just got this feeling that I didn't want to do it and I stopped . . . I turned around to walk away [and then] heard 'STOP!'"), and that he was motivated by personal and family financial crises, *see id.* at 20 ("I just needed money. I, my rent was due. My wife doesn't work. I have three kids.  I have a car loan.")  It was when the agents starting confronting him with evidence of other past robberies that they believed he had committed that Defendant appeared to become particularly upset and hesitant.  *See id.* at 27 ("You already said that you saying I did multiple robberies and I told you

I didn't so I'm trying to tell y'all that I know this like I'm gonna get buried under the system and I want y'all to help me and I want to help y'all but it doesn't seem like its going to go that way (crying).").  And far from being in such an altered state that he would agreed to "just about everything that you suggest," *id.* at 107, Defendant specifically denied being the robber in various of those other past robberies. *Id.*at 27 ("I'm telling you I didn't [commit multiple robberies"]), 28 ("those aren't me"), 61 ("Q. Did you ever rob anything other than a CVS? A. No. Q. You sure about that? A. Yes.") 62 ("I only rob CVS that's the only one that I did. I don't remember robbing family dollar.").  All of this tends to bespeak of free and rational choice.[8]

---

[8] Mr. Bachman testified that "you can't make any assessment" of Defendant's state of mind based on the recording and transcript of the interview. Tr. III [59] at 21-22.  This is among the category of opinions as to which the Court places minimal weight, however.  Again, as noted above, Mr. Bachman is not a psychiatrist, psychologist, medical doctor, or any other sort of mental health professional.  There is no foundation allowing him to offer a reliable opinion on the Defendant's mental state, how that could have been assessed at the time of the interview or now, and what light the recording and transcript of the interview may or may not shed on his contemporaneous mental state.  Obviously the Court cannot make any sort of medical findings or diagnoses.  But the Court finds that Defendant's statements in the interview are facially inconsistent with someone who is in such a state of euphoria that they would agree to "just about everything that you suggest," Tr. II [58] at 107, and are otherwise consistent with free, rational and calculated choice.  The speculation that the low strength of Dilaudid still present in Defendant's blood may have nevertheless impacted his decision making in some other indiscernible way is not enough to rebut or undermine this evidence of voluntariness.

Finally, but perhaps most importantly, the record suggests no police overreaching.  There is no indication that the agents took advantage of Defendant's condition, kept him from receiving medication or treatment, or conditioned his receipt of treatment on cooperation.  And the agents made sure to check with the duty nurse before interrogating Defendant.

Thus, the totality of the evidence, including the contemporaneous medical assessments, the testimony of the agents, and the record of the interview itself–balanced against the relatively low fraction of the medication still present in Defendant's bloodstream, and Mr. Bachman's acknowledgment as to the great variability in medication impacts–combine to establish sufficient evidence of Defendant's voluntariness.

B.   *Defendant's Statements Were Not Taken In Violation Of his Prompt Presentment Rights*

Even a voluntary confession may be suppressed if given as a result of law enforcement unreasonably and unnecessarily delaying the presentation of the arrestee in court.  This common-law concept is referred to interchangeably as the "prompt presentment rule," and the "*McNabb-Mallory* rule," named after two original Supreme Court cases that recognized this rule and the suppression remedy for its violation. *See McNabb v. United States*, 318 U.S. 332 (1943); *Mallory v. United States*, 354 U.S. 449 (1957).  This rule emanates from common law and the

supervisory authority the federal courts possess over the administration of justice, and the Supreme Court has declined to decide whether it has any Constitutional basis. *See McNabb*, 318 U.S. at 340-341.

Today, the rule and the consequences for its violation are codified in two places. Generally, Fed.R.Crim.P. 5(a) provides that "A person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge, or before a state or local judicial officer as Rule 5(c) provides, unless a statute provides otherwise." More specifically, 18 U.S.C. § 3501(c) provides that a post-arrest confession:

> shall not be inadmissible solely because of delay in bringing such person before a magistrate ... (1) if such confession is found by the trial judge to have been made voluntarily and (2) if the weight to be given the confession is left to the jury and (3) if such confession was made or given by such person ***within six hours immediately following his arrest or other detention;*** Provided, That the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate judge or other officer beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate judge or other officer.

18 U.S.C. § 3501(c) (emphasis added).

In prior cases the Government had taken the position that another subsection of the same statute, 18 U.S.C. § 3501(a), which provides that any confession is generally admissible "if it is voluntarily given," eliminated the prompt presentment

rule altogether.  The Supreme Court rejected this position in *Corley v. United States*,  556 U.S. 303, 313-314 (2009).  In *Corley*, the Supreme Court re-affirmed the *McNabb-Mallory* rule as modified by the six hour safe harbor period provided in 18 U.S.C. § 3501(c).  *Id.*  The Court's reasoning is summed up in the following phrase:

> Justice Frankfurter's point in *McNabb* is as fresh as ever: 'The history of liberty has largely been the history of observance of procedural safeguards.' 318 U.S., at 347, 63 S.Ct. 608. *McNabb–Mallory* is one of them, and neither the text nor the history of § 3501 makes out a case that Congress meant to do away with it.

*Corley*, 556 U.S. at 321.  As the Court explained, prompt presentment in court is not "just some administrative nicety," but rather "it stretches back to the common law, when it was 'one of the most important' protections 'against unlawful arrest.'" *Id.* at 320 (internal citations omitted).  In other words, "[i]n a world without *McNabb–Mallory*, federal agents would be free to question suspects for extended periods before bringing them out in the open, and we have always known what custodial secrecy leads to." *Id.*

Thus, the Court found that "§ 3501 modified *McNabb–Mallory* without supplanting it." *Corley*, 556 U.S. at 322.  The Court explained the current state of the prompt presentment rule as follows:

> Under the rule as revised by § 3501(c), a district court with a suppression claim must find whether the defendant confessed within six hours of arrest (unless a longer delay was "reasonable considering

the means of transportation and the distance to be traveled to the nearest available [magistrate judge]"). If the confession came within that period, it is admissible, subject to the other Rules of Evidence, so long as it was "made voluntarily and ... the weight to be given [it] is left to the jury." *Ibid.* If the confession occurred before presentment and beyond six hours, however, the court must decide whether delaying that long was unreasonable or unnecessary under the *McNabb–Mallory* cases, and if it was, the confession is to be suppressed.

*Id.* Several courts have held that the burden of demonstrating an unreasonable delay in presentment rests with the Defendant. *See United States v. Van Poyck*, 77 F.3d 285, 288 (9th Cir. 1996); *Miller v. United States*, 396 F.2d 492, 496 (8th Cir. 1968); *Tillotson v. United States*, 231 F.2d 736, 738 (D.C. Cir. 1956).

Here, it is undisputed that the Defendant was interviewed a full three days after his arrest, during which time he had never been presented to a judicial officer. However, "like other important rights, the right to prompt presentment may be waived." *United States v. McDowell*, 687 F.3d 904, 910 (7th Cir. 2012). The record includes a written waiver of prompt presentment executed by the Defendant (Gov't Ex. 3), and the agents also verbally went over the waiver with the Defendant. *See* Ex. 1A at 5-8. While the Defendant challenges the voluntariness of all of this waivers and statements, the Court finds against him on that issue for all of the reasons discussed above. Thus, suppression on grounds of a prompt presentment violation should be denied at the outset, as waived.

Moreover, even absent a waiver, Defendant's prompt presentment argument

must be denied.  "When determining whether a violation of Rule 5 has occurred,

courts consider the reasons for the delay, including factors such as the availability

of a committing magistrate, the length of the delay before the prisoner is taken

before the magistrate, and the police purpose or justification, if any, for the delay."

*United States v. Harrold*, 679 F.Supp.2d 1336, 1352-52 (N.D. Ga. 2009) (Thrash,

J.).  "Delays so that the arrestee can receive medical care and/or sober up have also

been sanctioned."  *United States v. Boche-Perez*, 755 F.3d 327, 337 (5th Cir.

2014); *United States v. George*, 987 F.2d 1428, 1431 (9th Cir. 1993) (delay

resulting from hospital care considered reasonable); *United States v. Johnson*, 352

F.Supp.2d 596, 597-98 (D. Maryland 2005) (same).

    Here, upon arresting Defendant, the officers immediately identified that he

had received and was bleeding from one or more bullet wounds.  Tr. I [47] at 39-

40.  The officers immediately applied a tourniquet and called an ambulance.  *Id*.

There cannot be a serious question that the officers acted reasonably in doing these

things, instead of bringing Defendant directly to Court while still bleeding from

bullet wounds.  The hospital staff then admitted Defendant and kept him under care

(including administering surgery) until the morning of April 7th.  Again, there can

be no serious argument that the officers should have violated these medical orders

and broken Defendant out of the hospital to bring him to court.  Indeed, the record

shows that the agents informed the duty judicial officer, Magistrate Judge Brill,

and inquired whether she would consider conducting an initial appearance at the hospital.  Judge Brill declined that unusual procedure.  Thus, a committing magistrate judge was not available until Defendant could be discharged from the hospital although the agents made attempts otherwise.

On the morning of April 7th, the agents interviewed Defendant prior to Dr. Moore's final assessment and order of discharge, which was issued approximately two hours later.  There is no evidence that the agents delayed Defendant's discharge.  And even after Dr. Moore's discharge order, the Defendant was still not physically released from the hospital for some time.  Defendant then appeared in court within a few hours of his discharge, that same afternoon.

Thus, the Court concludes that the Defendant's interview did not occur during any period of unreasonable delay.  The interview occurred during a period of medically-necessitated delay that was not caused or exacerbated by any actions by law enforcement, except insofar as it was law enforcement officers who quite responsibly called the ambulance in the first place.  Defendant's prompt presentment argument is meritless.

## CONCLUSION

For all of the reasons explained above, Defendant's Motion to Suppress Evidence [16] should be **DENIED** as abandoned, and Defendants Motions to Suppress Statements [14] [17] should be **DENIED** as meritless.  This matter is

**READY FOR TRIAL**.

    **IT IS SO ORDERED** this 21st day of November, 2016.

 

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE